IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CRIMINAL NO. 05-30115-WDS |
| | ) | |
| TAVON UPTON, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM & ORDER**

**STIEHL, District Judge:**

Defendant, Tavon Upton, has filed three motions related to suppressing evidence and statements. Doc. 19 seeks suppression of the defendant's confession; Doc. 20 seeks a Franks Hearing and an Order directing the government to produce the confidential informant for the hearing and to suppress the evidence seized as a result of the search warrant; and Doc. 23 seeks to suppress evidence seized as a result of the search warrant. The government has filed responses and defendant replies. The Court held two days of evidentiary hearings on the matter and took it under advisement pending further briefing by the parties. The parties have now filed their post hearing briefs (Doc. 68, 69).

**EVIDENCE RECEIVED AT THE HEARINGS**

Timothy M. Bedard testified that in July of 2003, he was a police officer for the Cahokia Police Department, assigned to the Drug Tactical Unit of the St. Clair County Sheriff's Department. At that time he was a six year veteran of the Cahokia Police Department and had received drug related training and certification, and prepared two written reports of investigation, one dated July 16, 2003, and the other October 16, 2003. Those reports concerned July 9 and July 15, 2003, controlled buys made from the defendant by a confidential source. Bedard had

used this CS on other occasions on an intermittent basis for other drug purchases. Bedard was aware that the CS was a drug user, but it was his belief on the dates he used her that she was not under the influence at that time.

Before the CS went into make the drug purchases, she was searched by Bedard in the presence of other officers. She remained with Bedard or another officer from the time of her search until she entered the defendant's home. Because she was a female and there was not a female office present, the search consisted of having her shake out her shirt and pants and checking her pockets.[1] She was accompanied to the defendant's home by Investigator Mark Hort who drove her in one of the undercover vehicles. The CS went to the front door and was waived to the back door. During the first buy, Sgt. Eversman, Investigator Nuemescheimer (phonetic) and Bedard were all present, positioned throughout the area with different views of the defendant's home.

The CS was in the defendant's home a few minutes, and then returned to the unmarked police car. She was searched in the same manner as before she made the buy. A similar process was followed both before and after the second buy on July 15th. Bedard testified that he had used the CS on other occasions, and that she has made multiple purchases of narcotics for the Drug Tactical Unit.

Based on these controlled buys, Bedard sought a search warrant from the St. Clair County Circuit Court for the defendant's address. When the application for the search warrant was presented to Judge Milton Wharton, he swore in Bedard, and asked him for a synopsis of the complaint, evidence or probable cause for the search warrant. Judge Wharton was advised of any buys that were made. Judge Wharton granted the application on July 15, 2003 (the same day

---

[1] Bedard stated that he did not do a full body or body cavity search on the CS.

2

as the second controlled buy), and on July 16, 2003, the search warrant was executed on the defendant's home.[2] The defendant attempted to flee the area, but was seized and placed in the back of a squad car by another officer. Bedard attempted to read the defendant his *Miranda* warnings, but the defendant was acting very aggressively, kicking and cursing at Bedard. In addition, the defendant attempted to get out of the car and had to be restrained and pushed back into the car by Bedard and Sgt. Eversman. Bedard testified that they both used open hands to push the defendant back into the car. Bedard participated in the search of the defendant's home. He testified that in addition to finding drugs and drug paraphernalia, he also found a loaded automatic pistol.

The defendant was transported to the Cahokia Police Department by Detective Phillip Taylor and Officer Karla Heine. The Cahokia Police Department is approximately four minutes away from the defendant's home. Bedard testified that he later learned that there was an incident during that transportation and that Det. Taylor had injured the defendant because he was trying to get out of the squad car.

Bedard went to the Cahokia Police Department to interview the defendant and again gave him his *Miranda* warnings. Gary Brewer, of the DEA Task Force, was present during some of the questioning of the defendant. The defendant indicated that he understood his rights, and did not appear to Bedard to be under any impairment or have an inability to understand. However, the defendant refused to sign his *Miranda* waiver form and refused to give a written statement. Although he refused to sign the waiver, the defendant did, however, indicate some interest in cooperating with law enforcement, and acknowledged that he was selling crack cocaine at his house to support his daughter and that he knew there was a firearm in his house. He said,

---

[2] Bedard testified that the complaint for the search warrant incorrectly stated that the dates of the controlled buys were 6-9-03 and 6-15-03, which was a typographical error. The actual dates were July 9 and July 15, 2003.

however, that the firearm belonged to a friend, although the defendant admitted touching the gun. As the defendant began making a statement, Bedard advised him that he could stop at any time. The defendant eventually asked for a lawyer and was returned to his cell at that time. The defendant was bleeding slightly from his nose, but did not ask for medical treatment or to see a doctor. Bedard did not observe any bruising around the defendant's face. A photograph was taken of the defendant after he was in custody (See. Govt. Ex. 2). The photograph shows him in a button shirt and a t-shirt with bloodstain on the front of his shirt.

Bedard prepared two reports concerning the defendant's arrest. The first report, dated July 16, stated that "Upton refused to give statements in reference to the incident." The amended report was prepared at the request of St. Clair County Assistant State's Attorney Fold, and reflects the oral statements made by the defendant. Bedard testified at the second day of hearing that the reference in the first report was intended to refer to written statements.

William Kenny, an investigator for the St. Clair County Sheriff's Department testified as to the arrest of the defendant. Kenny testified that there were two baggies of cocaine, one powder, one crack cocaine, found inside a box within arms reach of the defendant at the time of his arrest. Kenny transported the defendant to the St. Clair County jail and prepared a report. He did not observe the defendant was bleeding. During the drive, the defendant said that he wanted to talk with Sgt. Eversman about doing some work for him, but he would have to get out of jail.

Phillip Taylor, a detective with the Cahokia Police Department, testified that he and Det. Heine transported the defendant in a marked police car from the place where he was arrested back to his residence at 37 St. Justin. He did not observe any injuries on the defendant and the defendant did not ask for medical treatment. When the arrived at the defendant's home, other

officers took over talking to the defendant.  Taylor and Heine then transported the defendant from his home to the Cahokia Police Department.  During the few minutes drive, the defendant tried to get out of the police car by kicking the window and the door hard enough to make them bow out.  Taylor told him to stop kicking the door, and when he continued, Taylor stopped the car got out, opened the rear door on the passenger side and told the defendant to stop kicking the window and the door. Although the defendant was handcuffed, his feet and legs came out of the car and he was kicking both officers.  Taylor ordered him several times to get back into the car and tried to push him back into the car.  The defendant kept saying "I'm not going back to jail. I'm not going back to jail."  Taylor was attempting to push the defendant back into the car by pushing on his upper torso area while avoiding being kicked, but the defendant lowered his head and Taylor actually struck the defendant in the face one time with his open palm.  When they arrived at the police department Taylor observed that the defendant had a laceration across the bridge of his nose which was bleeding.  He offered the defendant medical attention, got out a medical kit, patted his nose dry, stopped the bleeding and cleaned up the defendant. The defendant did not request further medical attention.   The defendant was crying and very emotional, and said that he did not want to go back to prison.

       The defendant presented the testimony of Clifton Moulton, Jr., who, in May of 2002, was the head of security at Pop's Night Club in Sauget, Illinois.  Moulton testified as to an incident involving Detective Taylor who, while  involved in a struggle with another person, hit Moulton on the left side of his face underneath his eye as Moulton approached him to break up the fight. Moulton was left with a mild contusion and a residual scar.   As a result of an investigation of the incident by the Illinois State Police, Moulton, and several other Pop's employees, were eventually charged with misdemeanor assault and were later found guilty.   In addition, a civil

5

law suit was filed against Pop's Night Club as a result of the incident.

Mark Donald, the General Manager of Pop's Night Club, testified that he investigated the incident in question and determined that there were a two groups of bachelorette girls who got into a fight, and that as they were being taken outside by security guards, another group of males intervened, including Det. Taylor.  He observed Moulton bleeding after the incident.

Lt. Kurt Eversman, St. Clair County Sheriff's Department, testified the second day of hearings that he was supervisor of the Drug Tactical Unit from 2001 to November of 2005.  He testified as to the use of the confidential informant, and the process they use with respect to checking backgrounds, and forms that they have to complete. The CS used in this case had been signed-up by a predecessor of Lt. Eversman.  Before the incidents that led to this indictment, Eversman had used the CS on two or three prior occasions. He considered her to be reliable and the only financial compensation she received for her work was reimbursement for gasoline expenses. There were no other "benefits" given to her for her cooperation.[3]  Eversman testified that he has worked with her since the incidents that led to this indictment.

Eversman was present during Bedard's questioning of the defendant.  The defendant indicated that he wanted to work with them to bring them "bigger people."   Eversman observed that the defendant had a cut on his nose, and that his clothing was torn. He asked the defendant if he was hurt and he said that he did not want to talk about that, he wanted to get out of jail, but he wouldn't sign anything or write out a statement.  The defendant was not restrained in the interview room, but was able to walk around.  He did not make any aggressive moves towards

---

[3] Eversman testified that at one point he had a warrant quashed so that she could receive a new court date. The Court reviewed the materials submitted by the government *in camera* in response to the defendant's motion for the issuance of a subpoena duces tecum, pursuant to Rule 17(c) and issued a sealed order finding that there was "nothing in the *in camera* materials which would be subject to disclosure under either *Brady v. Maryland*, 373 U.S. 83 (1963), or *Giglio v. United States,* 405 U.S. 150, 153 (1972).  There [was] nothing in this record to reveal that there were any promises that she would receive specified benefits if she cooperated with law enforcement.  *Giglio*, 405 U.S. 152-55."

the interviewing officers.  A few minutes later, he asked for a lawyer.

**DISCUSSION**

    1.    *Franks* Hearing

A defendant is entitled to a *Franks* hearing if he makes a preliminary showing that an affiant knowingly, or with reckless disregard for the truth, made a false statement that was necessary for the determination of probable cause. *Franks*, 438 U.S. at 155-56; *Molina v. Cooper*, 325 F.3d 963, 968 (7th Cir. 2003); *United States v. Maro*, 272 F.3d 817, 821 (7th Cir. 2001). This rule applies equally to omissions that could reasonably affect the issuing judge's determination of probable cause. *See, e.g., United States v. Swanson*, 210 F.3d 788, 790-91 (7th Cir. 2000). The preliminary showing must be motivated by "more than a mere desire to cross examine":

> There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient.

*Franks*, 438 U.S. at 171.

    A.    Meeting the Required Showing

In *Franks,* the Supreme Court held that intentionally or recklessly submitting false statements in the affidavit supporting a search warrant violates the Fourth Amendment. 438 U.S. at 164-65. The Court further held that in certain limited situations, a defendant may obtain a hearing to present evidence challenging the affidavit's truth.

To obtain an evidentiary hearing, the defendant must make a "substantial preliminary showing" that the affiant has intentionally or recklessly included a false statement in the

affidavit, and that the false statement is material in order to find probable cause. *Id.* at 155-56; *see also United States v. Hornick*, 815 F.2d 1156, 1158 (7th Cir. 1987) ("[defendant] bears a substantial burden to demonstrate probable falsity"). The defendant "must offer direct evidence of the affiant's state of mind or inferential evidence that the affiant had obvious reasons for omitting facts in order to prove deliberate falsehood or reckless disregard." *United States v. McNeese*, 901 F.2d 585, 594 (7th Cir. 1990) (citation omitted).

If the material that is allegedly false is set aside, and "there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required." *Franks*, 438 U.S. at 171-72. In addition, there is a presumption as to the validity of the affidavit supporting the search warrant which must be overcome. *Id.* at 171.

    B.  Findings With Respect to *Franks* Showing

In this case the Court **FINDS** that the defendant has not made a sufficient showing that the affidavit on which the state search warrant was based was false or misleading. The Court accepts the statement of Bedard that the discrepancy in dates was merely a typographical error. On each of the controlled buys there were several officers present to observe the CS as she made her purchases from the defendant, and they testified as to the dates on which the buys occurred.

Similarly, the Court FINDS that the use of the CS and her pat-down after each of the controlled buys was not flawed. The Court has previously reviewed several documents submitted by the government for in camera review and has determined that there was nothing in those documents that rose to the level of either *Brady* or *Giglio* material to which the defendant would be entitled. The CS was known to the St. Clair County Sheriff's department and had cooperated with them on drug investigations in the past. "Generally, a controlled buy, when executed properly, is a reliable indicator as to the presence of illegal drug activity." *United States*

*v. Sidwell,* 2006 WL 568551 at *2 (7th Cir. (Wis.) 2006).

It is well settled that a controlled buy does not have to be perfect to establish probable cause. *Cf. United States v. Garcia*, 983 F.2d 1160, 1167 (1st Cir. 1993) (rejecting the defendant's contention that "the informant [who made the controlled buy] might have stashed cocaine elsewhere in the building out of the sight of the detective" as "strain[ing] credulity on a common-sense reading"). "Probable cause requires only a probability or substantial chance that evidence may be found; it does not, by contrast, require absolute certainty." *Sidwell*, at *2. Although the pat-down of the CS during the controlled buy may have been imperfect, this Court finds it persuasive the fact that the informant had completed numerous other controlled buys in the past and provided, on those occasions, accurate and reliable information. With respect to the pat-down of the CS, although it was not a full body search, she was searched by the officers before and after she went into the defendant's home. Although a female officer's presence for the pat-down would have been preferred, there is no basis for finding, in this case, that the information received from the CS, including the drugs she purchased from the defendant, was in any manner tainted or that the evidence seized as a result is subject to suppression.

Therefore, the Court **DENIES**, on all grounds, defendant's motion for a *Franks* hearing and to suppress evidence seized as a result of the search warrant, including the defendant's confession (Doc. 20)

    2.    <u>Defendant's Motion to Suppress Evidence</u>

In this motion, the defendant seeks suppression of evidence seized pursuant to the search warrant on the grounds that the warrant was "rubber stamped" by the state court judge (Doc. 23).

The crux of the defendant's motion is that the incorrect dates in the application for a search

warrant and the manner of the pat-down of the female CS by the male officers should have given the state court judge pause before issuing the warrant. The Court has previously determined that the date discrepancy was simply a typographical error and that the search and use of the CS was not improper. The Court **FINDS** that the CS was reliable as a source, was known to law enforcement and was not improperly used.

>As the court stated in *Sidwell:*
>
>>Probable cause exists when, considering all the circumstances, the affidavit sets forth sufficient facts to induce a reasonably prudent person to believe that a search will uncover contraband or evidence of a crime. *United States v. Olson*, 408 F.3d 366, 370 (7th Cir. 2005); *United States v. Peck*, 317 F.3d 754, 756 (7th Cir. 2003). The affidavit is to be interpreted in a practical, "common-sense manner." *United States v. Walker*, 237 F.3d 845, 850 (7th Cir. 2001) (*quoting Illinois v. Gates*, 462 U.S. 213, 238(1983)).

2006 WL 568551 at *1. The Court **FINDS** that the defendant has not established that the search warrant was merely a "rubber stamp" by the state court judge, and accordingly **DENIES** defendant's motion to suppress evidence seized on all grounds.

    3.       Motion to Suppress Statements

The defendant also seeks suppression of any statements he made on the grounds that his statement was not voluntary.  It was clear from the hearing that the defendant was combative and uncooperative. It also is clear that he received at least a bloody nose as a result of his behavior during his arrest and transportation to the Cahokia Police Department. However, there is nothing in the record to indicate that the defendant was suffering from an overborne will or was not properly advised of his rights under *Miranda*. The Seventh Circuit has stated that:

>the voluntariness of a statement is determined "by considering whether, in light of the totality of the circumstances, the statement was the product of a rational intellect and free will," "or whether it was obtained by the authorities through coercive means," *United States v. Brooks*, 125 F.3d 484, 492 (7th Cir. 1997) (*citing*

>*Mincey v. Arizona*, 437 U.S. 385, 398 (1978), and *Colorado v. Connelly*, 479 U.S. 157, 165(1986)).

*Ruvalcaba v. Chandler, 416 F.3d 555,* 561 (7th Cir. 2005).

Here, there is simply no evidence that the defendant's will was overborne, or that he was subject to improper, coercive actions by law enforcement.  The defendant may have been combative, and as a result received a bloody nose, but it appears his agitation was related to his desire to stay out of jail, and was not due to any improper force used by law enforcement. Moreover, the defendant was given his *Miranda* warnings two separate time.   Although he refused to sign the waiver, that does not render his confession involuntary.  The Seventh Circuit has held that the refusal to sign a waiver does not render the confession involuntary.  In *United States v. Smith,* 218 F.3d 777 (7th Cir. 2000), the court stated:

>a Miranda waiver need not be express. It may be inferred from a defendant's understanding of her rights coupled with a course of conduct reflecting her desire to give up her right to remain silent. *North Carolina v. Butler*, 441 U.S. 369, 373-76 (1979). Indeed, waiver may be inferred from the defendant's conduct, even when she has refused to sign a waiver form. *United States v. Banks*, 78 F.3d 1190, 1196-98 (7th Cir.1996), *vacated on other grounds*, 519 U.S.(1996), *on remand*, *United States v. Mills*, 122 F.3d 346 (1997), *cert. denied* 522 U.S. 1033 (1997).

218 F.3d at 280.   Here, the defendant indicated his intent to help himself by cooperating, essentially to stay out of jail.  The mere fact that he refused to sign the waiver form does not mean that he did not intend to waive his rights under *Miranda.*

Further,  "In evaluating whether a suspect voluntarily waived his *Miranda* rights, we consider the same factors that we considered above in assessing the overall voluntariness of a confession."  416 F.3d at 562  (citations omitted).  Applying this standard, the Court **FINDS** that the defendant voluntarily chose to cooperate with and give a statement to law enforcement. Notably, once he requested a lawyer, the questioning ceased.

11

Accordingly, the Court **DENIES** defendant's motion to suppress statements on all grounds raised.

## CONCLUSION

Accordingly, the Court **DENIES** defendant's motion to suppress statements (Doc. 19); **DENIES** defendant's motion for a *Franks* hearing and to suppress evidence and confession (Doc. 20); and **DENIES** defendant's motion to suppress evidence seized pursuant to a search warrant issued by the "rubber stamping" state court (Doc. 23) on all grounds raised.

**IT IS SO ORDERED.**

**DATED:   March 23, 2006.**

                                        s/ WILLIAM D. STIEHL
                                           DISTRICT JUDGE